Gaestel Motor Co., Ltd. (A Dissolved Corporation) v. Commissioner.
Gaestel Motor Co. v. Commissioner
Docket No. 5167.
United States Tax Court
1947 Tax Ct. Memo LEXIS 326; 6 T.C.M. (CCH) 63; T.C.M. (RIA) 47015; January 28, 1947
Edward Hale Julien, Esq., 220 Bush St., San Francisco 4, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax, declared value excess-profits tax, and excess profits tax for the calendar years 1941 and 1942 and five months of 1943 as follows: Declared
value
Income
excess-
Excess profits
tax
profits tax
tax
1941
$2,893.34
$2,604.09
$ 6,348.67
1942
972.23
10,266.48
1943 - Jan. 1
to May 31
4,809.94
The issues for decision are whether the Commissioner erred in disallowing as deductions, (1) the bonuses allegedly paid as additional compensation during taxable *327 years to officers of petitioner and, (2) the sum of $1,230 representing amounts credited to a reserve for salesmen's bonuses for the period January 1 to May 31, 1943. Petitioner filed its returns with the collector for the first district of California. Findings of Fact Petitioner, a California corporation, was incorporated on June 15, 1928. It was dissolved on May 31, 1943. It kept its books on an accrual basis. Issue 1. Throughout its existence petitioner was engaged in the business of operating a Ford automobile agency in Merced, California. Its business consisted in selling Ford cars as a dealer, selling parts and accessories, and buying and selling used cars. It also maintained an automobile repair and service shop which was open to the public, where all makes of cars could be serviced and repaired. After 1939 petitioner dealt in and serviced farm tractors, machinery and equipment. In connection with this part of its business, petitioner operated a branch in Madera, California. Petitioner was organized by Joseph Gaestel and Morton T. Kresteller. Gaestel had been a wholesale sales manager for the Ford Motor Company and was familiar with Ford products but he had little *328 experience in the retailing of automobiles. Kresteller had been a successful Ford dealer in San Francisco since 1917. He had wide experience as a dealer. Kresteller and Gaestel each invested $7,000 in petitioner initially. Each received 700 shares of stock in their own names, except for qualifying shares. Petitioner's capital stock increased until in 1940 there were outstanding 3,400 shares of capital stock. Of these shares, 1,699 were held by Gaestel and one by his wife; 1,200 were held by Kresteller, and 500 by his wife. The shares continued to be so held until February 14, 1943, when Kresteller died. Under a contract then in existence, Kresteller's stock was acquired by Gaestel at book value, approximately $20 a share. Gaestel purchased 1,200 shares in his own name, and 500 were placed in the name of Gaestel and his wife as joint tenants. Kresteller was president of petitioner and Gaestel was vice president from 1928 to 1933. From 1933 until May 31, 1943, Gaestel was president. Kresteller served as vice president and treasurer until his death. Gaestel died on October 1, 1943. Gaestel develoted his full time and energies to the business of petitioner from the date of petitioner's *329 organization until its dissolution. Kresteller, from the beginning and during the taxable years, devoted only a portion of his time to the business. Most of his time was occupied in personally managing the Kresteller Motor Co., a retail automobile agency, in San Francisco, of which he was the sole owner. During the existence of petitioner, Kresteller periodically visited Merced to discuss with Gaestel the problems of petitioner. During 1941 he visited Merced about six times. The evidence does not show anything about visits in 1942 and 1943. In October, 1942, Kresteller entered a hospital, where he remained until his death. After he entered the hospital, he did not render any services to petitioner. Between the times Kresteller visited Gaestel in Merced, he was in tough with Gaestel by mail and telephone. In the taxable years prior to October, 1942, as well as in earlier years, Kresteller handled for petitioner most of the negotiations for contracts with suppliers of parts and accessories other than the Ford Company. Kresteller was able to combine his purchases of parts and accessories for the Kresteller Motor Co. with his purchases for petitioner to achieve the benefits of larger *330 quantity buying. Kresteller, through his contacts, was also mainly responsible in the taxable years and prior thereto for placing insurance on cars sold by petitioner with insurance companies which would designate petitioner to repair damaged vehicles. Kresteller was able to perform these services for petitioner while conducting the operations of the Kresteller Motor Co. in San Francisco. The record does not disclose the amount of income in the taxable years or prior thereto, which petitioner derived from the purchases and the insurance contracts made by Kresteller, nor the amount of time Kresteller devoted in rendering these services to petitioner. When petitioner was organized in 1928, Kresteller, having had broader managerial experience than Gaestel in the retail automobile business, was responsible for most of petitioner's policies of operation which Gaestel carried out. Gaestel was the manager personally present and in charge of the everyday operations of the enterprise. Gaestel's duties required him to pass on trade-in values for all cars and to supervise all transactions relating to the sale of new and used automobiles. From the start, Gaestel handled most of the purchases *331 of Ford cars and parts from the Ford Company. After 1936 all such purchases were arranged by Gaestel. During the taxable years, Gaestel continued to be in active charge of the business. He personally managed and supervised the sales of new and used cars and the operations of the parts department and the service and repair shop. He continued to arrange for all purchases from the Ford Company, and took charge of petitioner's operations in selling and servicing farm tractors, machinery and equipment. Petitioner employed five salesmen in 1941, at least one office worker, and an undisclosed number of automobile mechanics, all of whom were under the control of Gaestel. Except for purchasing some accessories and handling insurance matters, Kresteller's services to petitioner in the taxable years prior to his illness were restricted to giving advice and counsel on matters of policy. Gaestel occasionally visited San Francisco to consult with Kresteller. After Kresteller became ill in 1942 the services he previously performed for petitioner were rendered by Gaestel or his associates. At all times Gaestel and Kresteller were in complete control of petitioner. On December 26, 1929, a meeting *332 of the Board of Directors was held for the purpose of fixing salaries to be paid to Gaestel and Kresteller. The minutes of the meeting recite "that the salaries which had been paid were not commensurate with the amount of time, energy and effort that had been put in and were not commensurate to the salaries being paid to managing officers of other companies engaged in like business," because it had been difficult to determine, when petitioner was organized, the amount of business which it would do and the salaries which it could pay. By resolution, the directors fixed the salaries for 1929 of Gaestel and Kresteller at $750 and $500 per month, respectively. The directors also adopted a resolution that for 1930 and subsequent years the compensation of Gaestel and Kresteller should be $4,800 and $1,200 per year, respectively, and that, in addition, each was to receive 25 percent of the net profits of the business as determined at the close of each calendar year. The fixed sums were to be drawn in twelve equal monthly installments and the balance, if any, was to be placed to the credit of the respective party on the books of the company at the close of the year. The fixed salaries of *333 $400 and $100 per month, respectively, were less than the fixed salaries for 1929. The minutes recited that Kresteller reported that "from the apparent general conditions and in the absence of an exceptional effort, the profits would be nowhere near those realized for the year 1929." On November 8, 1930, the fixed compensation of Gaestel was increased from $400 to $500 per month, or $6,000 per year. No change was made in the fixed compensation of Kresteller. In 1935 the fixed compensation of Gaestel again was increased from $500 to $600 a month, or $7,200 per year. Kresteller's fixed compensation was increased to $150 a month, or $1,800 a year. The fixed rates of compensation remained unchanged until June 17, 1942, when the fixed salary of Gaestel was increased from $600 to $700 per month. For 1942, Gaestel received a total of $7,800 as fixed salary. Although there was a suggestion that Kresteller's fixed salary might be reduced because he was not making as many trips to Merced as previously, and was therefore not put to the same amount of expense, his fixed salary continued to remain $150 a month until his death. The amounts of fixed salary and bonus which Gaestel and Kresteller *334 each received throughout petitioner's existence are set forth in Schedule A. The gross receipts, expenses, and earnings of petitioner for the years of its existence are set forth in Schedule B. SCHEDULE A
GAESTEL
KRESTELLER
Fixed
Fixed
Year
Salary
Bonus
Total
Salary
Bonus
Total
1928
$7,725
$ 1,765.00
$ 425
$ 425.00
(6 mos.)
1929
9,000
9,000.00
6,000
6,000.00
1930
4,800
$4,203.34
9,003.34
1,200
$4,203.34
5,403.34
1931
6,000
6,000.00
1,200
1,200.00
1932
* 5,000
5,000.00
* 1,000
1,000.00
1933
* 3,600
3,600.00
* 660
660.00
1934
* 5,000
1,841.99
6,841.99
1,500
1,841.99
3,341.99
1935
7,200
1,915.68
9,115.68
1,800
1,915.68
3,715.68
1936
7,200
2,099.83
9,299.83
1,800
2,099.83
3,899.83
1937
7,200
1,426.85
8,626.85
1,800
1,426.85
3,226.85
1938
7,200
7,200.00
1,800
1,800.00
1939
7,200
659.04
7,857.04
1,800
659.04
2,459.04
1940
7,200
2,615.00
9,815.00
1,800
2,615.00
4,415.00
1941
7,200
9,882.73
17,082.73
1,800
9,882.73
11,682.73
1942
7,800
6,759.62
14,559.62
1,800
6,759.62
8,559.62
1943
3,500
3,165.75
6,665.75
300
300.00
(5 mos.)
*335 SCHEDULE A
$
Total Fixed
Total
Total
Salary of
Bonuses of
Compensation
Year
G. & K.
G. & K.
of G. & K.
1928
$ 2,150
$ 2,150.00
(6 mos.)
1929
15,000
15,000.00
1930
6,000
$ 8,406.68
14,406.68
1931
7,200
7,200.00
1932
* 6,000
6,000.00
1933
* 4,260
4,260.00
19
* 6,500
3,683.98
10,183.98
1935
9,000
3,831.36
12,831.36
1936
9,000
4,199.66
13,199.60
1937
9,000
2,853.70
11,853.70
1938
9,000
9,000.00
1939
9,000
1,218.08
10,318.08
1940 9,000
5,230.00
14,230.00
1941
9,000
19,765.46
28,765.46
1942
9,600
13,519.24
23,119.24
1943
3,800
3,165.75
6,965.75
(5 mos.)
SCHEDULE B
Expenses
Net Earnings
Plus Fixed
Before
Bonus
Gross
Cost of
Salaries
Bonuses
Compensation
Year
Receipts
Sales
of G. & K.
and Taxes
to G. & K.
1928
$ 93,120.84
$ 72,101.81
$15,933.53
$ 5,085.50
(6 mos.)
1929
289,490.62
229,565.26
47,183.56
12,741.80
1930
293,066.58
256,847.21
23,047.96
13,171.41
$ 8,406.68
1931
193,013.51
152,846.04
41,529.65
- 1,364.07
1932
103,466.31
83,792.39
31,657.44
- 11,983.52
1933
129,077.61
101,656.26
27,431.33
- 9.98
1934
246,766.41
196,299.90
41,302.44
9,164.07
3,683.98
1935
418,459.17
345,477.21
62,919.22
10,062.74
3,831.36
1936
413,866.97
339,628.92
66,047.07
8,190.98
4,199.66
1937
434,781.94
354,500.74
74,438.16
5,843.04
2,853.70
1938
326,719.03
264,347.89
64,465.79
- 2,094.65
1939
348,956.93
285,427.42
60,893.36
2,636.15
1,318.08
1940
451,764.00
367,911.76
72,283.14
11,569.10
5,230.00
1941
602,945.00
478,453.10
84,960.98
39,530.92
19,765.46
1942
326,263.10
221,222.43
78,393.28
26,647.39
13,519.24
1943
136,022.97
92,715.58
30,644.40
12,662.99
3,165.75
(5 mos.)
*336 Total
Fixed Salary
Net Profit
Capital Stock
and Bonus
Before
Net Profit
Plus Earned
Year
of G. & K.
Taxes
After Taxes
Surplus
1928
$ 2,150.00
$ 5,085.50
$ 4,835.24
$18,129.55
(6 mos.)
1929
15,000.00
12,741.80
11,670.20
28,899.75
1930
14,406.68
4,764.73
4,552.96
37,888.99
1931
7,200.00
- 1,364.07
- 1,364.07
34,185.46
1932
6,000.00
- 11,983.52
- 11,983.52
22,201.94
1933
4,260.00
- 9.98
- 9.98
22,191.92
1934
10,183.98
5,480.09
4,726.58
27,672.05
1935
12,831.36
6,231.38
5,373.57
32,219.40
1936
13,199.66
3,991.32
3,359.42
35,610.72
1937
11,853.70
2,989.34
2,530.07
47,704.98
1938
9,000.00
- 2,094.65
- 2,094.65
45,488.17
1939
10,318.08
1,318.07
1,153.31
46,806.24
1940
14,230.00
6,339.10
5,375.64
51,788.06
1941
28,765.46
19,765.46
13,151.76
71,534.40
1942
23,119.24
13,128.15
7,753.63
77,105.35
1943
6,965.75
9,497.24
5,906.56
81,885.37
(5 mos.)
The foregoing schedules show that petitioner had net losses in the years 1931, 1932, 1933 and 1938. Aside from these loss years and the years in which petitioner was organized and dissolved, fixed salary and bonus payments to *337 Gaestel and Kresteller based on 25 percent of the net profits to each ranged in amount from approximately $10,200 for 1934 to about $28,800 for 1941. Gross receipts varied between a low of $250,000 to a high of $603,000 in these same years. Expenses including fixed salaries of Gaestel and Kresteller approximately doubled from $40,000 to $80,000, and net profits before taxes increased from about $5,400 in 1934 to $19,700 in 1941. Petitioner paid dividends in the years 1929 and 1930 in the respective sums of $1,400 and $9,600. No dividends were paid by petitioner after 1930. In 1928 and 1929 petitioner's outstanding capital stock consisted of 1,400 shares at a par value of $10 per share. In 1930 petitioner issued 500 shares each to both Gaestel and Kresteller in exchange for notes of petitioner held by them in the amount of $5,000 each. Petitioner's outstanding capital stock remained at 2,400 shares until 1937 when it issued 500 shares of stock each to Gaestel and Kresteller in cancellation of indebtedness in the total amount of $10,000 owing by it to them. Thus, they left a total of $20,000 in the business to increase the capital. In Kresteller's income tax returns for 1941 and *338 1942, he reported as salary from petitioner only his fixed compensation in the amount of $1,800 for each year. His bonuses in the amounts of $9,882.73 and $6,759.26 were reported as dividends received from petitioner. It is a practice in the retail automobile business such as that conducted by petitioner to pay its chief executive officers a bonus based on profits in addition to a fixed salary. Retail automobile salesmen are usually paid as part of their compensation a commission based on a percentage of the sales price. Issue 2. For the period January 1, 1943 to May 31, 1943, entries were made on petitioner's account entitled "Reserve for Salesmen's Bonuses" in the total amount of $1,230. The amounts credited to this reserve were to be used by petitioner at the end of the calendar year, 1943, for paying small bonuses to salesmen and employees, and for making good will gifts in appreciation for services rendered by friends of the business. The $1,230 did not represent a definite liability of petitioner incurred or accrued on May 31, 1943. The reserve for salesmen's bonuses was not a reserve for accrued wages, it was not paid by petitioner prior to or after its dissolution. The *339 entries did not give to any employee or business friend a legal claim to the $1,230 or any portion thereof. For the calendar year 1941 petitioner deducted the sum of $28,765.46 as officers' compensation. Respondent determined that the fixed salary of $7,200 paid to Gaestel represented reasonable compensation for the services performed by Gaestel for the year 1941; and that the $1,800 paid to Kresteller as fixed salary represented reasonable compensation for the services performed by Kresteller for that year. The total business expense deduction for salaries was therefore determined to be $9,000, and the sum of $19,765.46 was disallowed as a distribution of profits. For the year 1942, petitioner deducted the sum of $23,119.24 as officers' compensation. Respondent determined that reasonable salaries for Gaestel and Kresteller were their fixed salaries in the respective amounts of $7,800 and $1,800 or a total of $9,600. The balance of $13,519.24 was disallowed. For the period January 1 to May 31, 1943, respondent disallowed the alleged salary bonus paid to Gaestel in the amount of $3,165.75. He allowed $3,900 as deductible officers' compensation which represented payment of $300 *340 to Kresteller for January and February, 1943; $100 for one month to Gaestel's wife; and $3,500 to Gaestel for the five month period ending May 31, 1943 at the fixed rate of $700 a month. For the five month period ending May 31, 1943, respondent disallowed the deduction of $1,230, being the balance in the reserve for salesmen's bonuses at the time of the dissolution of petitioner. Respondent determined that the $1,230 was not deductible as an accrued liability since no definite liability for paying any bonuses to salesmen had been incurred. A reasonable allowance for compensation for personal services rendered to petitioner by Gaestel for the calendar years 1941 and 1942, and for the five month period ending May 31, 1943, were the respective sums of $17,082.73, $14,559.62 and $6,665.75. A reasonable allowance for compensation for personal services rendered to petitioner by Kresteller was $1,800 for each of the calendar years, 1941 and 1942, and $300 for the five month period ending May 31, 1943. Opinion The first issue relates to the amounts which petitioner may deduct as reasonable allowance for compensation to its two officers under section 23(a)(1) of the Internal Revenue Code *341 for the years 1941 and 1942, and the five month period ending May 31, 1943. Respondent has allowed deductions in all the taxable periods involved for the amounts of the fixed monthly salaries paid to Gaestel and Kresteller; and has disallowed deductions of the amounts of the year-end bonuses based on 25 percent of the net profits. Respondent's determinations carry with them a presumption of correctness, and petitioner has the burden of proving that it is entitled to deductions of larger amounts than respondent allowed. Miller Mfg. Co., Inc. v. Commissioner, 149 Fed. (2d) 421; Draper & Co., Inc., 5 T.C. 822. Kresteller. The evidence does not sustain the contention that the year-end additional payments to Kresteller were not excessive compensation and were not distributions of profits. Kresteller, from the beginning and during the taxable years, devoted only a portion of his time to the affairs of the petitioner. Most of his time was occupied in personally managing the Kresteller Motor Co., a retail automobile agency in San Francisco, of which he was the sole owner. Gaestel was the manager of petitioner and he personally attended to and was in charge of *342 the everyday operations of petitioner, devoting his full time and energies to the business. Except for purchases by Kresteller of accessories in connection with his purchases for the Kresteller Motor Co., and except for handling insurance matters, Kresteller's services to petitioner were restricted to giving advice and counsel on matters of policy. This had also been the extent of his contributions to petitioner for some years prior to the taxable years. Although Kresteller may have been responsible for most of petitioner's policies of operation at the time petitioner was first organized in 1928, there is no showing that his consulting services were of such value to petitioner in the taxable years as to warrant the extra year-end payments to him. The reduction of Kresteller's salary in 1930 indicates that the parties recognized that the managerial functions previously performed by Kresteller had, for the most part, been delegated to Gaestel. Gaestel was thoroughly capable of managing the affairs of petitioner, and as a matter of fact, he actually did so after the first years of petitioner's organization. Kresteller's visits to consult with Gaestel concerning the problems confronting *343 petitioner apparently declined in the taxable years. This is shown by the discussion that his fixed monthly salary might be reduced for the reason that he was not being put to the same amount of expense as he had incurred in prior years in making trips to Merced. In October, 1942, Kresteller became ill and entered a hospital. From that time until his death in February, 1943, he was unable to and did not render any services to petitioner. There is no evidence relating to the amount of time he devoted to the affairs of petitioner in the taxable years, or even prior thereto; nor as to what the value was to petitioner of his efforts in terms of dollars and cents. The value to petitioner of his alleged buying of large quantities of accessories from supply dealers other than from the Ford Motor Company, (all of which latter purchases were handled by Gaestel after 1936), and the value to petitioner of his insurance contacts are not shown by the evidence and the record leaves the question of such values open to speculation. The respondent determined that a fixed salary of $150 a month was a reasonable allowance for compensation for Kresteller's services during the taxable periods. Taking *344 into consideration all of the evidence, including the opinions of petitioner's expert witnesses and the methods used by them in arriving at their estimated value of Kresteller's services during the taxable years, it is held that a reasonable compensation for the services of Kresteller was $150 a month, and this had been found as a fact. Petitioner argues that it only paid its officers, Gaestel and Kresteller, an average salary of some $12,000 a year over all the years of its existence, having annual gross sales throughout this period in the neighborhood of $315,000. Such evidence has been considered, but it is to be remembered that the mere fact that the aggregate compensation to all officers is reasonable does not necessarily mean that an individual salary is not excessive. L. Scheppco., 25 B.T.A. 419; Lydia Pinkham Medicine Co. v. Commissioner, 128 Fed. (2d) 986. The statute allows deduction in a taxable year for an amount which is reasonable compensation for the services rendered in the taxable year. There is no evidence that Kresteller received in earlier years less than reasonable compensation for services rendered in those years; there is no evidence *345 that any part of the compensation paid to him in the taxable years represented a payment for services rendered in some earlier year; and there is no evidence of what would have been a reasonable amount in payment for the services he rendered in some earlier year. See Memphis Linotype Printing Co., 9 B.T.A. 666. Whatever may have been the intent of the bonus resolution in earlier years when Kresteller was instrumental in establishing petitioner's mode of operation, it appears that its effect, even for some years prior to the taxable periods, was to give Kresteller a distribution of the profits of the enterprise and not to compensate him for services actually rendered. Kresteller himself treated the bonuses as dividend income in his tax returns. The equality of the bonuses granted by petitioner to Gaestel and Kresteller consisting of 25 percent of the net profits to each, would seem inconsistent with any intention to compensate on the basis of value of services rendered where, as was true for many years, the time and energies devoted to the enterprise were so disproportionate. This can not be explained away on the ground that the differences in the fixed compensation adequately *346 gave recognition to the unequal efforts contributed by the two men. Omitting consideration for the moment of the nature of Gaestel's services and of his responsibility for the increased profits in the taxable years, clearly the record can support no inference that there was any cause and effect relationship between Kresteller's services and such increased profits. The facts relating to Kresteller's compensation do not bring the question within the purview of Regulations 103, section 19.23(a)-6(2), (3). It was advantageous for petitioner to allow its profits to be distributed to Kresteller in the guise of salary rather than in the form of a dividend. If such was the effect of the resolution, any original purpose to compensate Kresteller was superseded subsequently and payments thereunder in the taxable years may be properly characterized as distributions of profits to him. AmPlus Storage Battery Co. v. Commissioner, 35 Fed. (2d) 167. Gaestel. With respect to Gaestel, we think the matter stands on a different footing. Gaestel actually ran petitioner; he was in control of the enterprise; he devoted his full time to the business. Although both Gaestel and Kresteller *347 were not living at the time of the hearing, so that the record does not contain their testimony as to the exact nature of their duties, nevertheless, we are satisfied from the evidence adduced that Gaestel performed very valuable services for petitioner for which his salaries, including his year-end bonuses were reasonable compensation. Although Gaestel and Kresteller were equal stockholders, the payments of the bonuses under the resolution could consistently be treated as salary to Gaestel and dividends to Kresteller, since dividends in order to be dividends, need not be paid proportionate to stockholdings. See Lincoln National Bank v. Burnet, 63 Fed. (2d) 131. It is true, as the respondent suggests, that increased earnings not related to the activities of the officers do not warrant larger salary payments. To some extent, it may be that the war years' prosperity rather than Gaestel's efforts may have increased the earnings of petitioner in 1941, but the sales in 1941 were considerably larger than in prior years and, of course, entailed greater effort and services on the part of Gaestel. A new line was undertaken in farm machinery in 1939 to which he devoted time and *348 effort. His fixed salaries and bonuses did not increase disproportionately to other items of expense. The corporation earned a substantial amount on its capital after deducting from gross earnings the bonus payments made to Gaestel. In the years 1941 and 1942 Gaestel's compensation in the respective amounts of $17,082.73 and $14,559.62 averaged only 2.8 percent and 4.4 percent of petitioner's gross sales. Gaestel alone performed the real functions of management, and there is expert testimony in the record to the effect that in automobile agencies such as petitioner compensation to the managing officers based on 5 percent of sales is considered conservative; that it is a practice in the trade to compensate the chief executives by a percentage of the profits, 25 percent being common; and that the total compensation paid to Gaestel in each of the taxable years was a reasonable amount. From all the evidence, it has been found in the findings of fact that all of the fixed salary and bonus payments to Gaestel for the taxable years constituted a reasonable allowance for compensation for services rendered. Issue 2. The second issue relates to the disallowance of a deduction of the sum of *349 $1,230, representing amounts credited on petitioner's books to a reserve for salesmen's bonuses for the period January 1 to May 31, 1943. The amounts credited to this reserve were to be used by petitioner at the end of the calendar year, 1943, for paying bonuses in small amounts to salesmen and employees and for making year-end good will gifts in appreciation for services rendered by friends of the business. We must conclude from the facts that the entries which the petitioner described as a reserve were not true reserves for any real liability of petitioner. It was entirely within the election of petitioner whether or not it would pay salesmen bonuses at the end of the year or give any gifts to business friends. Thus what was set aside in an account entitled a reserve account amounted to a reserve for some contingent payments which petitioner might or might not make in its sole discretion. This was no real reserve. The question is whether the bookkeeping entries represented properly accrued liabilities of petitioner. The evidence does not show that the entries represented any liability of petitioner to pay any definite sums to any specific people at some particular time. The entries *350 were made in the books by petitioner as a voluntary or gratuitous matter. Hence the entries did not represent any liabilities which petitioner had incurred on or before May 31, 1943, which it properly could accrue. As a matter of fact, the amounts which were entered in the account were not paid by petitioner at all. It is held that respondent correctly disallowed deduction of the amount. Canton Art Metal Co., 6 B.T.A. 446; Horn & Hardart Baking Co., 19 B.T.A. 704; East Coast Motors, Inc., 35 B.T.A. 212; Taylor-Parker Co., Inc., 1 B.T.A. 1161; see also Willoughby Camera Stores, Inc. v. Commissioner, 125 Fed. (2d) 607. Decision will be entered under Rule 50. Footnotes
*. These amounts are less than the fixed salaries established in the resolution of the Board of Directors.↩